**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

FLORIDA CLEAN WATER NETWORK,
INC., et al.,

                Plaintiffs,

vs.                                              Case No. 3:08-cv-120-J-32TEM

COLONEL PAUL L. GROSSKRUGER,
etc., et al.,

                Defendants.

_____

## FINAL ORDER[1]

    With this suit, several environmental protection groups challenge the Army Corps of Engineers' issuance of a Clean Water Act Section 404 permit to the Panama City-Bay County Airport Authority for its Airport Relocation Project, which would move the Panama City-Bay County International Airport from its current site to a site near West Bay in the Florida Panhandle.  The case is now before the Court on the parties' cross-motions for summary judgment, the briefing of which then led to oral argument, now incorporated by reference.[2]

_____

   [1]Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

   [2]See Docs. 63, 64, 65, 66, 67, 69, 70, 71, 73, 74, 75, 78, 79 and attachments thereto (parties' motions for summary judgment, responses, and replies); Doc. 85 (transcript of August 29, 2008 motion hearing).  Plaintiffs Florida Clean Water Network and Citizens for the Bay adopted the briefs of the intervenor-plaintiffs, Natural Resources Defense Council and Defenders of Wildlife.  See Docs. 66, 71, 79, adopting Docs. 65, 69, 78.  Therefore, references to plaintiffs' positions will be to the briefs filed by the intervenor-plaintiffs.  The Corps filed the entire 20,515 page Administrative Record on a disc (Doc. 60), with a few

## I.      Background

The Panama City-Bay County Airport ("the Airport") started out in the early 1930's as a grassy landing strip in a 292-acre field donated to the local chamber of commerce on the shores of Goose Bayou, which spills out into the Gulf of Mexico in the Florida Panhandle. Construction of two runways, a terminal building, and attendant commercial enterprises soon followed and in 1943 the Florida legislature approved formation of the Panama City- Bay County Airport Authority ("the Authority") which has managed the Airport's growth ever since. In 1996, more than 150,000 people boarded planes at the Airport and its footprint had grown to cover an area more than three times its original size, with Goose Bayou still on the Airport's northwestern side, State Road 390 abutting it to the southeast, and heavy residential, commercial, and industrial development crowding in to the northeast and southwest.

With this growth, the Authority found itself facing several problems:  the current facility did not meet FAA safety standards for runway length and safety areas; future growth was limited by conflicts with surrounding military airspace[3]; the current operational limits were not compatible with projected future passenger demands, which the Authority hoped would include use of the Airport for international flights[4]; the location was vulnerable to storm

---

supplemental pages (Doc. 61).   "AR __" references are to the documents in the Administrative Record.

[3]Both Tyndall and Eglin airbases are nearby.  AR 12968.

[4]The Federal Aviation Administration ("FAA") designated the Airport as an international airport in 1992, which designation connotes the Airport's capacity to accommodate international arrivals with customs and immigration resources.  AR 12940.

surges and hurricanes; and environmental concerns arose from both noise impacts and storm surges. To address these problems, the Authority began to explore possible options for expansion or relocation. In 1998, the Authority proposed expanding its main runway into Goose Bayou but withdrew the plan in the face of objections on account of the adverse environmental impacts the expansion would have on Goose Bayou, a waterway protected by state law.

In 1999, with support from the FAA (whose approval was necessary to implement any plan), the Authority commissioned a feasibility study to explore its options for expansion or relocation of the Airport. AR 2381-2650. The 670 page study, released in July 2000, considered a variety of aviation and non-aviation issues and evaluated several alternatives before reaching its final recommendation that the Authority undertake a site selection study to pursue the relocation of the Airport. The subsequent site selection study identified two general areas in Bay County that avoided both conflicts with military airspace and impacts from hurricane storm surges. From within these two general areas, the study identified only one site that met these concerns and also held the potential for meeting the Airport's aviation safety requirements and expansion needs while avoiding direct impacts to waterways and minimizing future noise impacts. That site, the "West Bay Site," was a largely undeveloped 4,000 acre property primarily used for tree-farming activities by the property's owner, The St. Joe Company. At the Authority's request, St. Joe agreed to donate the West Bay Site property to the Authority for the relocated Airport. St. Joe additionally offered to place approximately 10,000 nearby acres under conservation easements to mitigate environmental

3

impacts caused by construction of the relocated Airport.[5]

Because the relocation of the Airport to the proposed West Bay Site would involve direct impact to wetlands, the FAA determined that the U.S. Army Corps of Engineers should become involved in the site selection process.  By at least August 2000, Corps personnel were attending planning meetings with members of the Authority and others, and a proposal was under consideration to pursue a "team permitting" approach, which would involve the inclusion of multiple interested agencies in the planning process.  AR 824.  Indeed, by September 2000, the list of agencies participating with the Authority and the FAA in the planning process for the possible Airport relocation included the Corps, the U.S. Environmental Protection Agency, U.S. Fish and Wildlife Service, National Marine Fisheries Service, Florida Department of Environmental Protection, Florida Fish and Wildlife Commission, Florida Department of Community Affairs, West Florida Regional Planning Council, Northwest Florida Water Management District, and Bay County, Florida.

With the prospect of relocating the Airport to the West Bay Site, the Bay County Board of County Commissioners initiated an Optional Sector Plan in accordance with Florida Statute section 163.3245[6] to facilitate the planned development of a 75,000 acre site in the

---

[5]To be sure, the donation of the land for the Airport made good business sense for St. Joe, as the prospect of a relocated Airport presented significant economic opportunities for development of St. Joe's other area land holdings.

[6]Florida Statute section 163.3245 authorizes local governments to seek approval from state land planning agencies for the creation of an Optional Sector Plan, which is designed to encourage "innovative and flexible planning and development strategies" for substantial geographic areas including at least 5,000 acres to emphasize urban forms while protecting regionally significant resources and facilities.

West Bay area that would include the relocated Airport and would balance the opportunities for economic development with the potential impacts on the environment.  After a series of public meetings designed to engage property owners, interested citizens, responsible government agencies and others, the Bay County Board of County Commissioners, in coordination with the Authority and St. Joe, issued "West Bay Area Vision" in January 2002, a comprehensive 50 year development plan that envisions the relocated Airport, an industrial district, public transportation routes, villages, business centers, and commercial centers, all of which would be buffered by conservation areas that would account for approximately 50% of the Sector area.  AR 3051-3472.  The proposal anticipates both short and long term development phases.  Consistent with the West Bay Area Vision, the Authority submitted its proposal to Bay County in February 2002 for the relocation of the Airport to a 4,000 acre site in West Bay.  AR 1935.

Meanwhile, although the FAA initially published a notice of intent to prepare an Environmental Assessment (EA) related to the airport relocation (AR 1201, referencing Fed. Reg. Notice of EA intent on Nov. 7, 2001), by April 2002, the FAA had determined that the airport relocation project was a "major federal action" requiring preparation of an Environmental Impact Statement (EIS).[7]   At the FAA's request, the Corps agreed to

_____

[7]Under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332, federal agencies must prepare an EIS where a proposed action "significantly affect[s] the quality of the human environment."  An EIS explores the environmental impact of a proposed action including, among other considerations, any of its unavoidable adverse environmental effects and alternatives to the action.  42 U.S.C. § 4332.  To avoid duplication of efforts where multiple agencies are involved with a proposed action, NEPA encourages the designation of a lead agency to work with and advise the cooperating agencies, which may adopt the lead agency's EIS if, following independent review, they are satisfied that it addresses their

participate in the EIS as a cooperating agency, with the FAA maintaining its role as the lead agency.  AR 18894.  The Authority submitted its original application to the Corps in 2003 requesting a 25 year permit to fill 1,929 acres of wetlands for the Airport Relocation Project. The Corps considered the application to be incomplete pending issuance of the draft EIS, which the FAA later issued in November 2004.  After conducting a series of public and agency meetings, compiling relevant data and having the Authority adjust some of the project parameters, the Corps published notice of the Authority's permit application in April 2005.  Various individuals and public and private agencies responded to the public notice.

In 2006, the FAA issued its Final EIS and its Record of Decision approving the West Bay Site for the relocation of the Airport.[8]  Although the FAA had determined that an airport with a 6,800 foot runway would meet the projected aviation demands in the market area, the Authority wanted to expand air service to accommodate international flights, which requires an 8,400 foot runway.  In issuing the Final EIS, the FAA approved the West Bay Site with an 8,400 foot runway.  Shortly thereafter, environmental groups (including the plaintiff-intervenors here) sought review of the FAA decision in the Second Circuit Court of Appeals, claiming, inter alia, that the FAA improperly acceded to the Authority's demands for an 8,400 foot runway when a shorter runway would support future aviation needs and result in fewer adverse impacts on the environment.  That suit has been briefed and argued and remains

_____

concerns.  Sierra Club v. U.S. Army Corps of Eng'rs, 295 F.3d 1209, 1215 (11th Cir. 2002) (citing various regulations).

    [8]These FAA documents are included in the Administrative Record the Corps provided to this Court.  See AR 11285-14432; 15826-16709.

pending at this time.

In August 2007, having completed its analysis of the permit application and its own independent review of the FAA's EIS, the Corps issued its Record of Decision.  AR 18533-18987.  In evaluating the project, the Corps, like the FAA, considered FAA safety and design standards and included the Authority's request for a runway that could support international flights.  The Corps also included the need for the project to be compatible with local and regional planning efforts.  AR 18892.  Although the criteria against which the Corps evaluated the project differed somewhat from those selected by the FAA, like the FAA, the Corps determined that the West Bay Site was the only alternative that would accomplish the purpose and need for the project.  The Corps therefore issued a permit for the Airport relocation "conceptual project" which contemplates the impact to 1,530 acres of wetlands on the 4,037 acre airport relocation site within a 50 year period, to be constructed in five phases, each of which requires further Corps authorization.  AR 18533-34.  Phase 1, which carries the project through the year 2018, is approved by the initial permit and allows impacts to 595 acres of wetlands to construct an 8,400 foot runway, a 5,000 foot runway, a terminal, air traffic control tower, access roads, parking, airport roadways and various attendant facilities.  AR 18536.  The Phase 1 permit also requires immediate implementation of the entire conceptual project's compensatory mitigation plan.  AR 18535.  The Phase 1 project is not dependent on the implementation of future phases of the project, each of which are due to be separately evaluated and permitted by the Corps.  AR 18896.

In February 2008, plaintiffs filed this suit and a motion for a temporary restraining order to suspend the issuance of the permit and halt the Airport construction.[9]  The Court denied all preliminary emergency relief, additional parties were permitted to intervene on both sides, the plaintiffs subsequently narrowed some of their claims and, as presented in the parties' cross-motions for summary judgment, the legal issues remaining before the Court have now been distilled to the following three: (1) whether the Corps abused its discretion or acted arbitrarily and capriciously in defining the project purpose; (2) whether the Corps abused its discretion or acted arbitrarily and capriciously in evaluating the project alternatives; (3) whether the Corps abused its discretion or acted arbitrarily and capriciously by not requiring the Authority to further minimize impacts to the West Bay Site.

## II.    Standard of Review

The entry of summary judgment is proper where "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  Summary judgment motions are appropriate procedural vehicles for the Court to review administrative agency decisions.  Florida Fruit & Vegetable Ass'n v. Brock, 771 F.2d 1455, 1459 (11th Cir. 1985) (quoting Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2733, Vol. 10A at 366 (1983)).  Here, the Court reviews the Corps' decision to issue a permit under the Clean Water Act pursuant to the "exceedingly deferential" standard

---

[9]Virtually all of the initial construction phases involved the filling of wetlands so suspending the Corps permit would have been tantamount to halting construction. An earlier stay of the FAA authorization (and subsequent construction) had been vacated by the Second Circuit days before this suit was filed.  (See Jan. 25, 2008 Second Circuit Order, Doc. 25, Ex. 13 at 2).

of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  Sierra Club v. Van Antwerp,

526 F.3d 1353, 1359-60 (11th Cir. 2008) (citation and quotation omitted).   Under that

standard, this Court will set aside the permit only if the Corps' findings and conclusions

undergirding its decision to issue the permit are found to be arbitrary, capricious, an abuse

of discretion or otherwise not in accordance with the law or without observance of the

procedure required by law.  Id. at 1360.  "The court's role is to ensure that the agency came

to a rational conclusion, not to conduct its own investigation and substitute its own judgment

for the administrative agency's decision."  Id. (citation and quotation omitted).  Thus, the

Court looks only to whether the Corps' "decision was based on a consideration of the

relevant factors and whether there has been a clear error of judgment."  Motor Vehicle Mfrs.

Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quotation omitted).  "As long

as the agency provides a rational explanation for its decision, a reviewing court cannot

disturb it."  Nat'l Wildlife Fed'n v. Whistler, 27 F.3d 1341, 1344 (8th Cir. 1994) (citing Citizens

to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).

### III.    Decision

The remaining issues[10] all center on the Corps' definition of the overall purpose of this

project:

> Development of air transportation facilities, which would meet
> Federal Aviation Administration (FAA) safety and design

---

[10]Plaintiffs have abandoned claims brought against the U.S. Fish and Wildlife Service under the Endangered Species Act (Count III).  They have also abandoned claims brought under NEPA (Counts I and IV and some aspects of Count II).  See Doc. 69 at 1-2.  The Court therefore dismisses those claims and defendants pursuant to Fed.R.Civ.P. Rule 41(a)(2).

> standards, which could operate and grow to allow future opportunities for expansion of air transportation services, including international charter operations, and which would be compatible with local and regional planning efforts within the region centered in Bay County, Florida.

AR 18892.

First, plaintiffs claim this narrow definition, which essentially adopted the Authority's proposal, functionally ruled out every possible alternative for the Airport Relocation Project except the West Bay site for which the permit was sought and issued.  Second, plaintiffs argue that had the Corps defined the project more broadly (or, at minimum, excluded the language regarding the international charter operations and the comprehensive planning compatibility), any of three particular iterations of renovations to the currently existing airport site would have been preferred as practicable alternatives because they result in fewer impacts to wetlands and the environment generally.  Finally, plaintiffs claim that even if none of the existing airport renovation alternatives were deemed preferable, impacts to the West Bay site could be further minimized with a broader statement of project purpose that eliminated the need for an 8,400 foot runway.

## A.    Definition of the Project Purpose

A landowner seeking to dredge or fill wetlands must generally secure a Clean Water Act Section 404 permit from the Corps.  Before the Corps will issue such a permit, it must first determine whether any less environmentally detrimental alternatives will accomplish the applicant's goal.[11]  In making this assessment, the Corps must carefully define what it is that

---

[11]While both NEPA and the CWA require the Corps to undertake an evaluation of alternatives, it is the CWA that directs the Corps toward selection of alternatives that pose

the applicant is proposing to do.  This process- - defining the project purpose- - is, therefore, a critical first step to the Corps' proper evaluation of practicable alternatives.  Initially, the Corps determines a project's "basic purpose" to assess whether the activity associated with the project is water dependent (such as a permit to build a marina) or not (such as a permit to build a hospital).  40 C.F.R. § 210.10(a)(3).  Where a project's basic purpose is not water dependent, the Corps will steer the project toward alternatives that do not involve discharges into wetlands.  Id.  Indeed, for those projects, the Corps presumes that such alternatives are available.  Id.  Once the basic purpose is determined, the Corps analyzes practicable alternatives in light of a project's "overall purpose," which is more particularized to the applicant's project than is the basic purpose, and reflects the various objectives the applicant is trying to achieve.  See Alliance for Legal Action v. U.S. Army Corps of Eng'rs, 314 F.Supp.2d 534, 548-49 (M.D.N.C. 2004).  In evaluating alternatives to a proposed project, an alternative may be deemed to be practicable even if it does not meet all of a project's components provided that any component it fails to meet is deemed to be "incidental" to the project's basic purpose.  Sylvester v. U.S. Army Corps of Eng'rs, 882 F.2d 407, 409 (9th Cir. 1989).  Although a project sponsor approaches the Corps with particular objectives in mind to be included in the Corps' statement of overall project purpose, the Corps must "in all cases, exercise independent judgment in defining the purpose and need for the project from the applicant's and public's perspective."  33 C.F.R. Part 325, App. B(9)(b)(4).  However, "it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a

---

less detrimental environmental impacts.  See 40 C.F.R. § 230.10(a).

permit and to substitute a purpose it deems more suitable." <u>Louisiana Wildlife Fed'n, Inc.</u>

<u>v. York</u>, 761 F.2d 1044, 1048 (5th Cir. 1985) (noting Corps' duty under the 404(b)(1)

Guidelines to account for sponsor's objectives in assessing project purpose).  Nonetheless,

the definition of a project purpose may not be used by the sponsor as a tool to artificially

exclude what would otherwise be practicable alternatives to the project- - in other words, the

sponsor's project purpose must be "legitimate." <u>Sylvester</u>, 882 F.2d at 409 (citation and

quotation omitted).  Thus, the project purpose may not be defined so narrowly that it

"make[s] what is [a] practicable [alternative] appear impracticable," yet the Corps cannot

ignore a sponsor's "genuine and legitimate" conclusions regarding the importance of a

proposed project. <u>Id.</u> (holding that Corps could not reject "genuine and legitimate" purpose

regarding particular type of golf course developer sought to permit because of its logistical

and economic advantages to developer's resort).  These concepts are reiterated in the

Corps' Standard Operating Procedures, which explains that the Corps' statement of project

purpose must address the applicant's needs in terms of the "desired geographic area of the

development" and "type of project being proposed," but must not be "so restrictive as to

preclude all discussion of alternatives."  Doc. 65, Ex. 2 (Corps Standard Operating

Procedures (October 15, 1999)) at 7.

Here, the Corps considered the Authority's proposed project as presented in its permit

application, as well as the FAA's EIS, which included a statement of project purpose

prepared by the FAA.[12]  In its Record of Decision, the FAA noted that its own evaluation of

---

[12]The FAA has statutory obligations to promote transportation policies and respond to aviation development needs (see AR 12959), and, like the Corps, also undertakes an

the project purpose coincided with the Authority's "except in the area of economic goals and forecast aviation demand."  AR 15848.  In a 2003 study, the FAA had determined that a runway of 6,800 feet would be sufficient to meet the area market's projected aviation needs through the year 2018.  The FAA noted that the Authority proposed an 8,400 foot runway to accommodate wider-body jets than are currently operating in that market and to attract new carrier service including, possibly, non-stop international charter operations.  AR 15848. Although the Authority's forecasts of future demand were higher than those of the FAA, they were within acceptable FAA limits of variance.  Ultimately, after considering the Authority's objectives and studying various alternatives, the FAA endorsed the Authority's proposal to build a relocated airport with an 8,400 foot runway at the West Bay Site.[13]

As a cooperating agency, the Corps looked to the findings of the FAA as the lead agency for guidance when the Corps conducted its own evaluation of the project.  In doing so, the Corps determined that the basic purpose of the Authority's proposed project was "[d]evelopment of commercial and civil air transportation facilities" (AR 12982), which the Corps determined was not a water dependent activity.  The Corps next arrived at a statement of overall project purpose that essentially has three components:  first, the airport must meet FAA safety and design standards; second, the airport's future expansion should

_____

evaluation of alternatives pursuant to NEPA, which requires it to identify and define the sponsor's project purpose.  Whether the FAA has arbitrarily and capriciously done so here is the subject of the earlier referenced lawsuit now pending before the Second Circuit.

[13] Because of the variance, however, federal funding would only be available to support the 6,800 feet of runway deemed necessary by the FAA, with the Authority securing other funding sources for the remaining length.  AR 15908-09.

be able to accommodate use by international charter flights; and third, the project should be compatible with the comprehensive planning efforts for the region.  AR 18892.  Plaintiffs take issue with the second and third components of the Corps' statement of project purpose and the Court therefore asks whether the Corps' decision to include either of these components was an abuse of discretion or arbitrary and capricious.

As to the choice to include expansion that would accommodate international charter flights (with resulting requirements for construction of an 8,400 foot runway), the Corps "accepted" the Authority's "goal" of developing an airport facility that "could expand to meet projected air transportation demands and that would allow for future growth and expansion opportunities by providing flexibility in the siting, sizing, and configuration of the airfield and landside aviation facilities."  AR 13055.  While true that the FAA did not predict that future aviation need would require an 8,400 foot runway, its predictions looked only to 2018 based on models of current usage.  The Authority, on the other hand, was proposing an airport that would fit into Bay County's entire long-range development plan for the region.  It intended that a new and expanded Airport would serve as a catalyst for regional aviation growth because it would eliminate the restrictions imposed on growth by the current airport's infrastructure limitations.  AR 3066.  And indeed, the FAA acknowledges that the 8,400 foot runway would provide the airport with "added flexibility."  AR 15902.  The record supports that the Corps considered the concerns raised by those opposed to the project and the comments of those who favored it, it considered the FAA's position, and it considered the goal of the Authority before determining that the project purpose should appropriately include flexibility for growth opportunities sufficient that international charter operations could use the

airport.  The Court finds this objective "legitimate," and not merely "incidental" to the project's basic purpose, <u>Sylvester</u>, 882 F.2d at 409, and, according the Corps the deference it is due, on this record the Court cannot find that the Corps abused its discretion or acted arbitrarily or capriciously in its decision to include accommodation for international flight activity in its statement of project purpose.  <u>See</u> <u>Alliance for Legal Action</u>, 314 F.Supp.2d at 547-50 (finding Corps did not err in adopting airport authority's "legitimate" project purpose which was to construct a cargo hub that would accelerate long-term economic goals for region); <u>Great Rivers Habitat Alliance v. U.S. Army Corps of Eng'rs</u>, 437 F.Supp.2d 1019, 1026-27 (E.D. Mo. 2006) (finding Corps did not arbitrarily define project where its narrow statement of purpose was not a pretense; purpose appropriately accounted for city's objectives derived through process of detailed study to promote future job growth and long-term economic health and viability, even though other record evidence found city's projections optimistic).

As to the third component of the statement of project purpose- - that the project "be compatible with local and regional planning efforts within the region centered in Bay County, Florida"- - plaintiffs contend that this component demonstrates that the Corps has impermissibly allowed local site-specific planning desires to override the Corps' obligation to protect wetlands by independently arriving at an appropriate project purpose that addresses the legitimate need for the project.

In making this argument, plaintiffs cite a Corps policy memorandum issued in the matter of the permit application of Hartz Mountain Development Corporation.  <u>See</u> Doc. 16, Ex. 3, Part C (Memorandum of Patrick J. Kelly, Director of Civil Works, to Commander, U.S. Army Corps of Engineers, New York District, Permit Elevation, Hartz Mountain Development

15

Corporation (Aug. 17, 1989)) (hereinafter, "Hartz Mountain memo"). In Hartz Mountain, a developer sought Corps authorization to impact 97 acres of wetlands for the construction of a 3,301 unit residential housing development in Hackensack, New Jersey. Id. The local District intended to issue the permit, but Corps headquarters ordered further review of the developer's application because the District had accorded "undue deference to the applicant's wishes" when it eliminated alternatives that could not support a 3,301 unit project. In the Hartz Mountain memo, Corps headquarters acknowledged that local zoning and land use planning may have restricted available sites, but the answer, held the Corps, was to consider limiting the scope of the project, rather than eliminating all alternatives based on a restrictively narrow project purpose. Headquarters directed that a broader statement of purpose, such as "construction of a large scale, high density housing project in the [ ] region" would accomplish the developer's objectives without unnecessarily ruling out all alternatives. Id. at 6.

Similarly, plaintiffs point to Simmons v. U.S. Army Corps of Engineers, 120 F.3d 664 (7th Cir. 1997), for the proposition that the Corps must demonstrate truly independent analysis of a permit applicant's proposal, even where the proposal is based on years of study and comes from a municipality. In Simmons, the city of Marion, Illinois sought a permit from the Corps to dam a creek to create a lake to provide a new city water source that would supply both its own needs as well as those of a neighboring town to which Marion would sell some of its new water. 120 F.3d at 667. The project plans had been in the making for a number of years by the time the Corps approved the permit. Id. at 667-68. Nonetheless, in holding that the Corps failed to make an appropriately independent evaluation of project

16

purpose, the Seventh Circuit found the Corps improperly adopted the city's suggestion that a single water source should be secured to serve both Marion and the neighboring town, without questioning whether some other formulation might address the need for the project without being so narrowly defined.  Id. at 667-69.  Thus, the unduly narrow statement of project purpose resulted in a failure to consider other reasonable alternatives to the project, "ruining" the Corps' environmental impact statement and requiring that the permit be vacated.  Id. at 667, 670.[14]

The Corps' decision-making in both Simmons and Hartz Mountain was flawed because in each of those cases, the Corps accepted an applicant's project purpose without considering whether the question could be framed differently.  In other words, the Corps allowed components which were incidental to the basic purpose to control the Corps' decision-making process, thereby unnecessarily eliminating consideration of what otherwise might have been practicable alternatives to the project.

Here, unlike in Simmons or Hartz Mountain, the relatively site-specific design of the project is required as a necessary component of the Authority's proposal because the airport is part of an entire regional development plan.[15]  The role of the Corps in evaluating the

_____

[14]Although the Simmons case was brought as a challenge under NEPA against the Corps in its EIS decision-making, both NEPA and the CWA involve the evaluation of alternatives whose legitimacy is based on a properly framed statement of project purpose.  Thus, the analysis of Simmons is appropriately considered here. See Alliance for Legal Action, 314 F.Supp.2d at 547-48 (equating NEPA's reasonable alternatives analysis with the CWA's practicable alternatives analysis, while noting their procedural and substantive differences).

[15]As noted below, at the behest of the Corps and other agencies, the Authority modified its initial proposal for the siting of the Airport within the West Bay Sector to reduce its environmental impact.

project purpose as proposed by the Authority was to determine whether it was "legitimate." In assessing a project, the Corps' Standard Operating Procedures direct that "the applicant's needs must be considered in the context of the desired geographic area of the development, and the type of project being proposed."   Doc. 65, Ex. 2 (Corps Standard Operating Procedures (October 15, 1999) at 7).   Thus, the Corps considered the record before it, including the EIS prepared by the FAA and the West Bay Vision Plan (which, as noted above, envisions a fifty year regional development plan anchored by the relocated Airport), and determined that compatibility with these local and regional comprehensive planning efforts was a necessary and not incidental component of the project, notwithstanding that this component foreclosed consideration of other geographic alternatives.   Thus, unlike Simmons, where the basic purpose was to provide a municipal water source, or Hartz Mountain, where the basic purpose was to provide large scale, high density housing in a particular region, here the basic purpose was to develop aviation facilities and, after efforts at expanding the current site were deemed environmentally untenable, the County looked to use the airport project as a centerpiece to stimulate economic development in the region at the only site that could accommodate growth and FAA safety and military airspace concerns while avoiding hurricane storm surges, thereby adding an appropriate, albeit site specific, component to the Authority's proposed project.

Moreover, here, the Corps itself was involved in the planning stages of the project, and the record supports the legitimacy of the Authority's and County's efforts to use the possibility of a relocated airport to stimulate growth through strategically planned regional development involving input from multiple federal and state agencies.   By its very nature, a

18

transportation infrastructure project such as this depends upon forecasted area growth and corresponding aviation needs and the sheer size of such an undertaking essentially requires that it be commercially viable and consistent with local and regional planning efforts. Moreover, while it is true that the Hartz Mountain memo explains that local zoning may not override the Corps' selection of the least damaging practicable alternative, (Hartz Mountain memo at 7), the suggestion that this guidance means the Corps cannot consider local planning is tempered by the Corps' own regulations which require that it consider any applicable "officially adopted state, regional, or local land use classifications, determinations, or policies" when evaluating a proposed impact to wetlands. 33 C.F.R. § 336.1(c)(11)(ii). Thus, the Corps' decision to include "compatibility with local and regional planning" as a component of the project purpose is not a contrivance to avoid a serious alternatives evaluation and does not make the purpose illegitimate. The Corps is required to consider the applicant's objectives for the project- -  it would be "bizarre" not to. Sylvester, 882 F.2d at 409 (quoting Louisiana Wildlife Fed'n, Inc. v. York, 761 F.2d 1044, 1048 (5th Cir. 1985)). While there is always the danger that in defining a project purpose, the Corps will simply create a "self-fulfilling prophecy," on this record, the Court finds the Corps' decision to include this component was neither an abuse of discretion nor arbitrary and capricious. See Great Rivers Habitat, 437 F.Supp.2d at 1026-27 (holding that Corps' statement of project purpose was not arbitrary where it was in accord with city's stated development objectives); Whistler, 27 F.3d at 1346 (holding that Corps properly accepted developer's site-specific statement of project purpose as providing boat access from river to housing development where there was no basis to believe that developer intentionally defined project so as to

19

exclude alternatives); <u>Northwest Envtl. Defense Ctr. v. Wood</u>, 947 F.Supp. 1371, 1377 (D.Or.) (holding Corps did not define project purpose too narrowly by restricting project to "Eugene area" because record supported multinational company's legitimate economic reasons for choosing Eugene), <u>aff'd</u>, 97 F.3d 1460 (9th Cir. 1996) (Table).

### B.    Evaluation of Existing Airport Alternatives

In a related argument, plaintiffs claim the Corps failed to consider practicable alternatives.  Plaintiffs essentially concede that if the overall project purpose has been framed such that it excludes any "incidental" components, then the Corps' evaluation of alternatives was not flawed.  This is so because none of the alternatives except the now permitted West Bay Site can, "[1] meet FAA safety and design standards, [2] operate and grow to allow future opportunities for expansion of air transportation services, including international charter operations, and [3] be compatible with local and regional planning efforts within the region centered in Bay County, Florida."[16]  AR 18892.  The Court has already found the Corps did not err in framing the project purpose when the Corps accepted each of these components as being "legitimate" and not merely incidental to the project's basic purpose.  The Court therefore need not address whether the Corps' evaluation of the other existing site alternatives was properly handled because none of those alternatives comply with the third component of the overall project purpose (that the project be

---

[16]When this case was before the Court on plaintiffs' motions for temporary restraining orders and preliminary injunction, they argued that there were other sites (aside from the current airport) which were practicable alternatives that would have been compatible with the project purpose.  <u>See</u> Doc. 47 (hearing transcript) at 49-52.  Those arguments have since been abandoned.

compatible with local and regional planning).   Moreover, even if that component were eliminated from the statement of project purpose, the record shows the Corps did not act arbitrarily or capriciously in rejecting the existing site alternatives both because they could not provide an 8,400 foot runway (see AR 13669-70 [October 24, 2003 letter to FAA from Florida Department of Environmental Protection objecting to runway expansion at current site]; AR 12974-75 [EIS documentation regarding National Marine Fisheries Service's concern about runway extension]), and because of concern that the alternative Engineered Materials Arresting System ("EMAS") solutions were a poor substitute for lengthier runways (see AR 12965-68, 13005-07, EIS discussion regarding EMAS alternatives), thus implicating the very basic (and non-contested) requirement that the project comply with FAA safety and design standards.  See 40 C.F.R. § 230.10(a)(2) (directing Corps to consider cost, existing technology and logistics when evaluating alternatives); see also Friends of the Earth v. Hintz, 800 F.2d 822, 833-34 (9th Cir. 1986) (upholding Corps rejection of two alternatives based on cost and another two based on logistics).  Thus, plaintiffs' reliance on cases such as Utahns for Better Transportation v. United States Department of Transportation, 305 F.3d 1152 (10th Cir. 2002), is misplaced because, unlike in Utahns, where the court found the Corps erred by allowing incidental "amenities" to the project purpose to dictate its rejection of otherwise available alternatives, id. at 1188-89, here, no alternative met the legitimate components of the overall project purpose.  The Court therefore finds on this record that the Corps' evaluation of alternatives was not arbitrary or capricious, nor an abuse of discretion.

21

### C.     Further Minimization of Impacts to West Bay Site

Plaintiffs further contend that the Corps acted arbitrarily and capriciously because it could have minimized impacts to the West Bay Site by reducing the runway size to 6,800 feet, which would have saved an additional 125 acres of wetlands.  However, because the Corps did not act arbitrarily and capriciously in defining the project purpose, it cannot be faulted for not reducing the runway size to 6,800 feet because a runway of this length would not have complied with the legitimate project purpose of building a runway of sufficient length to accommodate international charter flights.  Moreover, the Authority worked with the Corps and the Florida Department of Environmental Protection to take measures to reduce the footprint of the airport project, resulting in saving over one hundred acres of wetlands, including some of high quality.  AR 11403, 18890-91.  Additionally, the permit requires extensive mitigation to ameliorate the effects of impacts where further avoidance or minimization was not available. AR 18537-38 (permit, special conditions 1 and 2).  See also 33 C.F.R. 325.4(a)(3) (allowing mitigation to serve as amelioration for project impacts).  The Corps did not act arbitrarily or capriciously by not further minimizing impacts to the West Bay Site.

### IV.     Conclusion

The Court is satisfied that the Corps did not abuse its discretion or act arbitrarily or capriciously in issuing a Clean Water Act Section 404 permit to the Panama City-Bay County Airport Authority for its Airport Relocation Project.  Accordingly, it is hereby

**ORDERED**:

1.      Pursuant to Federal Rule of Civil Procedure 41(a)(2), plaintiffs' claims against Gail A. Carmody and the United States Fish and Wildlife Service (Count III) and plaintiffs' claims against Colonel Paul Grosskruger and the United States Army Corps of Engineers under NEPA (Counts I and IV and those aspects of Count II raising issues under NEPA) are **DISMISSED WITH PREJUDICE**.   Aspects of defendants' and intervenor-defendants' motions for summary judgment addressed to the dismissed claims are **MOOT**.

2.      Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs' and Intervenor-Plaintiffs' Motions for Summary Judgment (Docs. 65 & 66) are **DENIED**.

3.      Pursuant to Federal Rule of Civil Procedure 56, defendants United States Army Corps of Engineers and Colonel Paul L. Grosskruger's and intervenor-defendant Panama City-Bay County Airport and Industrial District's Motions for Summary Judgment (Docs. 63 & 64) are **GRANTED** in favor of defendants and intervenor-defendants as to plaintiffs' and intervenor-plaintiffs' Clean Water Act claims brought under Count II of their complaints.

4.      In accordance with this Order, the Clerk shall **enter judgment** in favor of defendants United States Army Corps of Engineers and Colonel Paul L. Grosskruger and against plaintiffs Florida Clean Water Network, Inc., Citizens for the Bay, Inc. and intervenor-plaintiffs Natural Resources Defense Council and Defenders of Wildlife on the Clean Water Act claims brought under Count II of the complaints.  Following entry of judgment, the Clerk shall close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 30th day of October, 2008.

TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:
counsel of record

24